*Notice: This opinion is subject to correction before publication in the Pacific Reporter. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

# THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| VOTE YES FOR ALASKA'S FAIR SHARE, | ) ) ) | |
| Appellant and Cross-Appellee, | ) ) ) ) | Supreme Court Nos. S-18044/18063 |
| | ) | Superior Court No. 3AN-20-05901 CI |
| v. | ) ) | O P I N I O N |
| RESOURCE DEVELOPMENT COUNCIL FOR ALASKA, INC., ALASKA TRUCKING ASSOCIATION, INC., ALASKA MINERS ASSOCIATION, INC., ASSOCIATED GENERAL CONTRACTORS OF ALASKA, ALASKA CHAMBER, and ALASKA SUPPORT INDUSTRY ALLIANCE, | ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 7674 – December 1, 2023 |
| Appellees and Cross-Appellants. | ) ) ) | |
| and. | ) ) | |
| KEVIN MEYER, in his official capacity as Lt. Governor of the State of Alaska; GAIL FENUMIAI, in her official capacity of Director of the Alaska Divisions of Elections; and STATE OF ALASKA, DIVISION OF ELECTIONS, | ) ) ) ) ) ) ) ) | |
| Appellees. | ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Thomas A. Matthews, Judge.

Appearances: Robin O. Brena and Jon S. Wakeland, Brena Bell & Walker, P.C., Anchorage, for Appellant. Matthew Singer and Peter A Scully, Schwabe, Williamson & Wyatt, P.C., Anchorage, for Appellees Resource Development Council for Alaska, Inc., et al. Notice of nonparticipation filed by Katherine Demarest, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellees Lieutenant Governor of the State of Alaska, Director of the State of Alaska Division of Elections, and the State of Alaska Division of Elections.

Before: Winfree, Chief Justice, Maassen, Carney, and Henderson, Justices. [Borghesan, Justice, not participating.]

HENDERSON, Justice.
WINFREE, Chief Justice, with whom CARNEY, Justice, joins, concurring in part.

## I. INTRODUCTION

A group of trade associations sued the State and a ballot initiative group seeking to invalidate the State's approval of a ballot initiative petition. The litigation focused primarily on the constitutionality of a statute limiting the compensation that may be paid for obtaining signatures on ballot initiative petitions. The superior court ruled that the statute was unconstitutional and dismissed the trade associations' claims that a large number of petition signatures should be invalidated because the statutory compensation limits had been exceeded.[1]

The ballot initiative group then moved for an attorney's fees award against the trade associations. The ballot initiative group contended that it was a qualified

---

[1] We affirmed the superior court's decision in an earlier appeal. *Res. Dev. Council for Alaska v. Vote Yes for Alaska's Fair Share*, 494 P.3d 541, 543-53 (Alaska 2021).

prevailing constitutional claimant entitled to an award of full reasonable attorney's fees under AS 09.60.010,[2] or at least an award of partial attorney's fees under Alaska Civil Rule 82.[3] The trade associations responded that the ballot initiative group could not be a constitutional claimant because it was not a "plaintiff, counterclaimant, cross claimant, or third-party plaintiff," and argued that if the ballot initiative group was a constitutional claimant, then they were qualified non-prevailing constitutional claimants entitled to protection from an attorney's fees award.[4] The ballot initiative group responded that the trade associations could not be constitutional claimants because they had sufficient economic incentive to bring their claim regardless of its constitutional nature.

The superior court concluded that the ballot initiative group was a constitutional claimant because its claim was effectively a counterclaim. But the court also concluded that the trade associations did not have sufficient economic incentive to bring their claim regardless of its constitutional nature, and they therefore were constitutional claimants protected from an award of full attorney's fees under

---

[2]    AS 09.60.010(c)(1) and (d)(1)-(2) provide that a prevailing party — "as plaintiff, counterclaimant, cross claimant, or third-party plaintiff in the action" — may obtain an award of full reasonable attorney's fees devoted to constitutional claims upon which the party prevailed so long as the party did not have sufficient economic incentive to bring the claims regardless of their constitutional nature.

[3]    *See* Alaska R. Civ. P. 82(a) ("Except as otherwise provided by law or agreed to by the parties, the prevailing party in a civil case shall be awarded attorney's fees calculated under this rule.").

[4]    AS 09.60.010(c)(2) provides that a party — "as a plaintiff, counterclaimant, cross claimant, or third-party plaintiff in the action" — who brings but does not prevail on a constitutional claim may be protected from an adverse award of attorney's fees so long as the constitutional claim was not frivolous and the party did not have sufficient economic incentive to bring the claim regardless of its constitutional nature.

AS 09.60.010. The court nonetheless awarded the ballot initiative group partial attorney's fees under Rule 82.

The ballot initiative group appeals, effectively limiting its argument to whether the superior court correctly determined that the trade associations were qualified constitutional claimants because they did not have a sufficient economic incentive to bring their claim regardless of its constitutional nature. The trade associations also appeal, arguing that if they are qualified constitutional claimants, then the Rule 82 attorney's fees must be vacated.

We affirm the superior court's determination that the trade associations did not have a sufficient economic incentive to bring their claims. Therefore, in light of the way the parties litigated the matter, the trade associations are qualified, non-prevailing constitutional claimants and the Rule 82 attorney's fees award must be vacated.

## II. FACTS AND PROCEEDINGS

### A. Facts

We outlined many of the facts relevant to this appeal in our previous decision, *Resource Development Council for Alaska v. Vote Yes for Alaska's Fair Share*.[5] That decision addressed whether the lieutenant governor properly certified a ballot initiative from Vote Yes for Alaska's Fair Share (Fair Share) regarding changes to an oil and gas production tax for certain fields.

As we outlined in that decision, the lieutenant governor approved Fair Share's petition for its ballot initiative to appear on the 2020 statewide ballot,[6] and the Division of Elections printed petition booklets for circulation so Fair Share could gain

---

[5] 494 P.3d at 544-45. The State parties had participated in this previous case, but took no position regarding the attorney's fees issue in this appeal and cross-appeal and filed a notice of non-participation.

[6] *Id.* at 544.

the required signatures of qualified voters.[7] Fair Share hired a professional signature-gathering company that sent signature-gatherers (called circulators) to circulate the petition booklets.[8] These circulators ultimately provided 544 of the 786 signed petition booklets Fair Share submitted.[9] In March 2020, the lieutenant governor confirmed that Fair Share's initiative had been "properly filed" and would be placed on the 2020 general ballot.[10]

## B. Proceedings

### 1. Decisions on the merits

A group of trade associations — Resource Development Council for Alaska, Inc.; Alaska Trucking Association, Inc.; Alaska Miners Association, Inc.; Associated General Contractors of Alaska, Inc.; Alaska Chamber; and Alaska Support Industry Alliance (collectively the "Trade Associations") — challenged the Fair Share ballot initiative as invalid.[11] The Trade Associations argued that the ballot initiative was improperly certified because the compensation for ballot circulators exceeded the statutory threshold of $1 per signature.[12]

The Trade Associations filed suit against the State and Fair Share, claiming that Fair Share's petition was improperly certified.[13] They requested

---

**7** *Id.* For the petition to appear on the ballot, Fair Share had to obtain voter signatures " 'equal in number to 10 percent of those who voted in the preceding general election,' representing 'at least three-fourths of the house districts of the state,' with each of those house districts providing signatures 'equal in number to at least seven percent of those who voted in the preceding general election in the house district.' " *Id.* at 543 (quoting AS 15.45.140(a)).

**8** *Id.* at 543-44.

**9** *Id.* at 544.

**10** *Id.*

**11** *Id.*

**12** *Id.*

**13** *Id.*

declaratory relief that "petition booklets that are supported by false circulator affidavits have not been properly certified under AS 15.45.130 and that the signatures in those booklets may not be counted," and also sought injunctive relief ordering the lieutenant governor to invalidate the booklets and associated voter signatures.[14] The State and Fair Share both moved to dismiss, and after limited discovery the Trade Associations cross-moved for partial summary judgment.[15]

Initially, the Trade Associations' complaint had focused on Alaska statutes, particularly the statutory cap on circulator compensation. But as the superior court noted, the constitutionality of the statute quickly became and remained a central issue throughout the litigation. Both the State and Fair Share highlighted the protection of constitutional free speech rights and challenged the circulator compensation statute as unconstitutional under the Alaska and United States Constitutions.

The superior court dismissed the Trade Associations' action on constitutional grounds. The court noted that constitutional claims were at issue for both parties, and explained that "[t]he Alaska Constitution enshrines the right of the people to propose and enact laws by initiative, and to approve or reject acts of the legislature by referendum. Also implicated are fundamental First Amendment rights to engage in core political speech." The court also provided an in-depth explanation of Alaska's initiative process. It explained that "[p]etition circulation is 'core political speech' " that "is protected by the First Amendment." But it noted that "there must also be regulation of elections to ensure they have qualities of fairness and honesty . . . to ensure that there is some order, rather than chaos, to accompany the democratic process."

Ultimately, the superior court agreed with the Trade Associations' interpretation of the signature payment statute, but held the statute unconstitutional. It

---

[14] *Id.*

[15] *Id.* at 544-45.

explained that the statute was unconstitutional because "the prohibition on payment greater than $1 per signature under AS 15.45.110(c) is an unconstitutional restriction on free speech protected by the First Amendment to the United States Constitution." The court also noted that the Trade Associations' proposed remedy of disregarding 39,000 valid signatures on the petition was constitutionally flawed and would result in disenfranchisement of thousands of Alaska voters.

The Trade Associations appealed the superior court's dismissal, and we affirmed, holding that AS 15.45.110(c)'s limitation on circulator compensation was unconstitutional and concluding that the petition was properly certified.[16] We agreed that the statute provided a hard cap on all forms of circulator compensation, and that Fair Share's circulators' monthly compensation exceeded the statutory $1 per-signature cap.[17] But we also agreed that nevertheless, the petitions were properly certified because "the $1 a signature limit, as a hard cap, is an unconstitutional restriction on core political speech," thus eliminating the statutory basis for the Trade Associations' challenge to the petition certification.[18]

### 2. Decisions on attorney's fees

After the superior court's decision on the merits, Fair Share moved for full reasonable attorney's fees as a "constitutional claimant," arguing that it met the statutory definition because it was the prevailing party on constitutional claims and lacked sufficient economic incentive to otherwise bring suit. It urged that the "case involved fundamental rights to the initiative and political speech under the Alaska Constitution, as well as political speech under the U.S. Constitution."

Fair Share stated that it "successfully defended the constitutional rights of Alaskans" and "itself against [the Trade Associations'] efforts to impair the

---

[16] *Id.* at 549-54.

[17] *Id.* at 545-46.

[18] *Id.*

constitutional rights to initiative and political speech." It argued that we had "found no sufficient economic incentive or interest in similar circumstances" and that it should thus receive full reasonable fees. Fair Share contended that the "Court need look only to AS 09.60.010 to determine its fees . . . as a prevailing constitutional claimant." In the alternative, it requested that the court award it enhanced attorney's fees pursuant to Rule 82(b)(3).[19]

The Trade Associations opposed the motion for attorney's fees, contending that Fair Share was not a "constitutional claimant" because it was not a "plaintiff, counterclaimant, cross claimant, or third-party plaintiff" that affirmatively brought a constitutional claim. They also argued that "[i]f Fair Share is a constitutional claimant merely because it raised constitutional arguments in its motions practice, then by that logic [the Trade Associations] are also immune" from fee liability under the same statute. The Trade Associations cited *Alaska Miners Association v. Holman*, where we ruled that a non-prevailing constitutional litigant was immune from attorney's fees under AS 09.60.010(c)(2). [20]

The superior court held that Fair Share was a constitutional claimant because it "successfully defended itself against Plaintiffs' efforts to impair the constitutional rights to initiative and political speech." The court also held that the Trade Associations were non-prevailing constitutional claimants "because they

---

[19]     Rule 82(b)(3) grants a court discretion to vary an attorney's fees award from the standard fee awards, based on consideration of several factors including the complexity of litigation, length of trial, vexatious or bad faith conduct, and other equitable factors that the court deems relevant.

[20]     397 P.3d 312, 317 (Alaska 2017). Like the Trade Associations here, the Alaska Miners Association had sued the Division of Elections and several sponsors of a ballot initiative that would have required large-scale mining operations to undergo additional legislative approval. *Id.* at 313. But unlike the Trade Associations' statutorily based complaint, the initial complaint in *Holman* asserted constitutional arguments. *Id* at 313-14.

assert[ed] constitutional arguments in their summary judgment pleadings" and "did not prevail in this suit." Examining the evidence of whether the Trade Associations had sufficient economic incentive to otherwise bring suit, it concluded that "Fair Share has failed to establish that [the Trade Associations] have a direct economic incentive to bring this action." It noted that "the case was brought by various trade associations that represent a multitude of interests. While each Plaintiff may have varying reasons for participating in this suit, Fair Share has not demonstrated what *direct benefits* Plaintiffs derive from filing this suit." (Emphasis in original.) In reaching this conclusion, the court examined the nature and composition of the trade associations and their members, the nature of relief sought, and the variety of interests represented in the lawsuit. The court considered Fair Share's assertion that the Trade Associations were "acting as proxies for the major oil companies that were funding the [OneAlaska — Vote No on One] campaign against the ballot initiative, as well as the litigation in this case." But the court noted that "the OneAlaska — Vote No on One campaign did not bring this suit." Noting the lack of evidence of direct economic incentive such that "successful litigation would only confer indirect or attenuated economic benefits to [the Trade Associations]," the court concluded that the litigation was "not primarily motivated by economic interests as required by the statute." It therefore determined that the Trade Associations were protected from attorney's fees as non-prevailing constitutional claimants.

Despite deeming the Trade Associations "constitutional claimants" and therefore protected from attorney's fees, the court then turned to Rule 82 and its provisions for awarding fees. The court found that Fair Share had not sufficiently supported its request for an "upward variance" in Rule 82 fees, but awarded Fair Share

the standard 20% of actual attorney's fees reasonably and necessarily incurred.[21] It deducted or reduced some contested billing entries, and ultimately awarded Fair Share $13,100 in Rule 82 attorney's fees.

## III. STANDARD OF REVIEW

Interpreting AS 09.60.010 is a question of law that we review de novo.[22] "We apply our independent judgment to questions of law, adopting the 'rule of law that is most persuasive in light of precedent, reason, and policy.' "[23] When a question of statutory interpretation is involved, we will independently evaluate the trial court's interpretation.[24]

## IV. DISCUSSION

The main issue before us is who, if anyone, is a constitutional claimant, and what attorney's fees, if any, attach as a result.[25] We agree with the superior court

---

[21] Rule 82(b)(2) establishes that in cases involving no money judgment that are resolved without trial, the prevailing party shall be awarded 20% of its "actual attorney's fees which were necessarily incurred."

[22] *Alaska Conservation Found. v. Pebble Ltd. P'ship*, 350 P.3d 273, 279 (Alaska 2015). We have contemplated whether constitutional claimant status also "could be a discretionary determination by the superior court or a mixed question of fact and law." *Id.* at 284 n.60. But interpreting a statute is a question of law we review de novo, and the constitutional claimant analysis is "generally made on indisputable facts." *See Dep't of Health & Soc. Servs. v. Planned Parenthood of the Great Nw.*, 448 P.3d 261, 262 (Alaska 2019) (Winfree, J., concurring). We therefore review constitutional claimant status de novo as a question of law.

[23] *DeVilbiss v. Matanuska-Susitna Borough*, 356 P.3d 290, 294 (Alaska 2015) (quoting *Young v. Embley*, 143 P.3d 936, 939 (Alaska 2006)).

[24] *Id.*

[25] In this instance, because the Trade Associations are plaintiffs whose arguments focused on constitutional claims, we consider them constitutional claimants. We do not, however, decide the issue whether a private party may violate another private party's constitutional rights such that either party could qualify as a "constitutional litigant" for purposes of attorney's fees, as neither party raised or briefed that issue.

that the Trade Associations are constitutional claimants. The court therefore erred in awarding Rule 82 attorney's fees to Fair Share. That determination is dispositive, so we do not reach the question whether Fair Share is a constitutional claimant.

### A. Statutory Overview

Rule 82 generally entitles a prevailing party in a civil matter to an attorney's fees award.[26] Beginning in 1974 we recognized a "public interest exception" to Rule 82 that protects litigants raising important public interest matters from the disincentive of attorney's fees.[27] In *Anchorage v. McCabe* we reasoned that the public interest exception encouraged good faith public interest claims and that in fee-shifting jurisdictions like Alaska, the public interest litigant serves as a "private attorney general" vindicating a significant legislative policy.[28] We adopted a three-prong test to determine whether an action qualified for the public interest exception, considering: first, whether the action effectuated strong public policy; second, whether numerous people would benefit from successful litigation; and third, whether "only a private party could have been expected to bring th[e] action."[29] In 1982 we added a fourth prong requiring that parties claiming the public interest exception demonstrate a lack of economic incentive to bring the litigation.[30]

In 2003 the Alaska Legislature abrogated and replaced the public interest exception to Rule 82.[31] The legislature intended that a new statute, AS 09.60.010,

---

[26]    *See* Alaska R. Civ. P. 82(a); *Gilbert v. State*, 526 P.2d 1131, 1136 (Alaska 1974), *superseded by statute*, AS 09.60.010. *See also Alaska Conservation Found.*, 350 P.3d 273, 279-80 (Alaska 2015) (outlining history of public interest exception).

[27]    *Alaska Conservation Found.*, 350 P.3d at 279-80.

[28]    568 P.2d 986, 990 (Alaska 1977), *superseded by statute*, AS 09.60.010.

[29]    *Id.* at 991 (quoting *La Raza Unida v. Volpe*, 57 F.R.D. 94, 101 (N.D. Cal. 1972)).

[30]    *Kenai Lumber Co., v. LeResche*, 646 P.2d 215, 223 (Alaska 1982).

[31]    Ch. 86, §§ 1-2, SLA 2003 (codified at AS 09.60.010(b)-(e)).

would, much like Rule 82's public interest exception, encourage private parties to speak up for constitutional rights while mitigating the risks of loss and the costs of pursuing a suit, particularly one that might not result in damages.[32]  Relevant to this appeal, the "constitutional claimant" provision operates as both a sword and a shield.[33]  Prevailing qualified constitutional claimants must be awarded attorney's fees associated with their constitutional claims.[34]  Non-prevailing qualified constitutional claimants must be protected from paying the attorney's fees of their opponents provided the claims are not frivolous or motivated by direct economic incentive.[35]

B.     **The Trade Associations Are Non-Prevailing Constitutional Claimants Under AS 09.60.010.**

The primary issue on appeal related to the Trade Associations' constitutional claimant status is whether they had sufficient economic incentive to bring the suit regardless of the constitutional claims.  We hold that the Trade Associations are non-prevailing constitutional claimants because they lacked sufficient direct economic incentives to otherwise bring their challenge.

We determine whether a litigant is a constitutional claimant by focusing "on primary purpose:  A litigant has sufficient economic incentive to bring a claim when it is brought primarily to advance the litigant's direct economic interest, regardless of the nature of the claim."[36]  To determine "primary purpose" we generally examine two

---

[32]     *See Alaska Conservation Found.*, 350 P.3d at 280-81 (outlining legislative history).

[33]     *See* AS 09.60.010(c)(1)-(2).

[34]     AS 09.60.010(c)(1).

[35]     AS 09.60.010(c)(2).  Section (d) of the statute further refines the fees and associated costs available to prevailing parties, stating that the award must include only the portion of the prevailing party's claims concerning constitutional rights and must be awarded only if the prevailing party "did not have sufficient economic incentive to bring the suit."  AS 09.60.010(d)(1)-(2).

[36]     *Alaska Conservation Found.*, 350 P.3d at 281-82.

factors: first, the nature of the claim and the relief sought; and second, the direct economic interest at stake.[37] As to the first factor, the nature of the claim and the relief sought, we "look to statements made in the pleadings and proceedings about the rationale for the lawsuit, to whether the relief requested was equitable or legal, and to the amount of money in controversy, to determine whether the litigant had sufficient economic incentive to bring the claim."[38] The facts of the case, including arguments the parties make throughout the litigation, inform our determination of the primary purpose.[39] That a litigant seeks injunctive and declaratory relief alone is informative but not dispositive in determining whether a litigant had sufficient economic incentive to bring a claim.[40] Here, the Trade Associations devoted much of their briefing, including their summary judgment arguments, to demonstrating that the United States Constitution did not bar the state from regulating the initiative process. As the superior court found, neither the constitutional arguments nor the statutory arguments were frivolous. The Trade Associations sought only declaratory and injunctive relief, not monetary relief, meaning that the decision of the lawsuit in itself would not result in direct financial gain. Thus the first factor favors the Trade Associations being constitutional claimants.

---

[37]    *Id.* at 282-83.

[38]    *Id.* at 282.

[39]    *Id.*

[40]    *Id.* (noting that "the type of relief sought" is not conclusive: " 'Economic interest need not take the form of damages,' and requesting injunctive relief does not guarantee a lack of economic motivation" (quoting *Matanuska-Susitna Borough Sch. Dist. v. State*, 931 P.2d 391, 403 (Alaska 1997))); *see also Eyak Traditional Elders Council v. Sherstone, Inc.*, 904 P.2d 420, 426 (Alaska 1995) (concluding that "economic incentives were simply not at the heart of the [qualified public interest litigant's] motive to litigate" though its suit sought money damages along with injunctive relief).

As to the second factor, the direct economic interest at stake, we have noted that "we have never required that parties seeking constitutional-claimant status . . . be completely disinterested in the case."[41] As we have emphasized in suits involving elections and the ballot-initiative process, "possible or speculated impact" is not direct economic benefit.[42] We have repeatedly limited the proper inquiry to examining whether there are "direct economic benefits [that] will flow to the claimant as a result of successful litigation" and not "when it would confer only indirect or attenuated economic benefits."[43] We have held that superior courts err where they look to "future possibilities and contingencies well outside the contours of the litigation to conclude that [the] case was not *merely about*" the constitutional issue at hand.[44] We have also recognized that third-party funding of constitutional litigation with direct economic benefit to that party can be relevant to the constitutional claimant analysis.[45] But regardless of the funding source, any economic benefit must still be direct in order to defeat constitutional claimant status: "Focusing on the funding of constitutional litigation rather than on the litigation itself to determine primary purpose . . . can lead easily to the wrong result."[46]

---

[41] *Alaska Miners Ass'n v. Holman*, 397 P.3d 312, 317 (Alaska 2017).

[42] *Id.*

[43] *Alaska Conservation Found.*, 350 P.3d at 283; *see also Kodiak Seafood Processors Ass'n v. State,* 900 P.2d 1191, 1198-99 (Alaska 1995) (rejecting possible economic effect of litigation outcome on crab fishing industry as too speculative to support direct "economic benefit" and finding for crab fishers); *Ninilchik Traditional Council v. Noah*, 928 P.2d 1206, 1218–19 (Alaska 1996) (same in commercial fishing industry).

[44] *Alaska Conservation Found.*, 350 P.3d at 284 (emphasis added).

[45] *Id.* at 285.

[46] *Id.*

Fair Share urges that the Trade Associations have direct economic incentive "by proxy." Fair Share characterizes the Trade Associations as merely "nominal Plaintiffs" who are acting on behalf of the "major oil producers." Fair Share requests that we reverse the superior court and hold that the Trade Associations had sufficient economic incentive based on the "additional $1 billion per year in production taxes" that the major oil producers would have to pay if Fair Share's ballot measure succeeded. Alternatively, Fair Share asks us to remand for "discovery into the funding and control of this litigation."

But we already rejected such an approach in *Alaska Conservation Foundation*, even after the superior court there had permitted discovery analogous to what Fair Share seeks here.[47] In that case, we recognized that "commercial . . . interests may fund litigation by others . . . but this does not automatically transform otherwise indirect economic benefit into direct economic benefit."[48] As in *Alaska Conservation Foundation*, here "the underlying litigation was limited" to constitutional requirements, and did not directly affect the economic interests of any non-party interested in the result.[49]

We reiterated this principle in *Alaska Miners Association v. Holman*, which involved a constitutional challenge to the ballot-initiative process as related to a ballot measure that would require additional legislative approval for large-scale mining operations.[50] Similar to Fair Share's arguments here, the litigants in *Holman* argued that a group of trade associations, funded in part by Pebble Limited Partnership (Pebble), had a direct economic incentive to bring a suit because the ballot measure

---

[47] *See id.* at 275-78 (describing discovery process).

[48] *Id.* at 285.

[49] *See id.*; *Alaska Miners Ass'n v. Holman*, 397 P.3d 312, 316-17 (Alaska 2017).

[50] *Holman*, 397 P.3d at 313-17.

"inject[ed] uncertainty" as to whether Pebble Mine development could proceed and therefore could "have an immediate impact in the form of lowering the stock prices of companies associated with the Project."[51]

We rejected this argument, stating that "[w]e reiterate and emphasize — again — that *direct* economic benefit is needed" to show sufficient economic incentive.[52] Even with no dispute that Pebble partially funded the ballot measure litigation,[53] we concluded that the trade associations in that case lacked direct economic incentive to bring suit. And because "the primary purpose of the litigation was to bring constitutional challenges to a ballot initiative," we held that the trade associations were protected from attorney's fees as constitutional claimants "regardless of the real party in interest and regardless of the economic interests of [the trade associations'] typical members."[54] We noted that "we have never required that parties seeking constitutional-claimant status . . . be completely disinterested in the case" and instructed that "[p]ossible or speculated [economic] impact is not enough."[55]

Following *Holman*, we consider the Trade Associations' real or speculative connections to "major oil producers" insufficient to establish *direct* economic impact in this context. Fair Share asserts that the Trade Associations' economic impacts are more direct than those in *Holman* because the Trade Associations are "acting as proxies for the major oil companies . . . and the oil companies had sufficient economic incentive to file suit because the Fair Share Act will directly impact

---

[51]     *Id.*

[52]     *Id.* at 317 (emphasis in original.).

[53]     The superior court found that Pebble financed at least part of the litigation, and at oral argument the plaintiffs conceded that Pebble both partially financed the suit and agreed to indemnify all named plaintiffs in the event of an adverse attorney's fees ruling. *Id.* at 313-15.

[54]     *Id.* at 317.

[55]     *Id.*

the production taxes they must pay." It urges that "direct ties to the entities that would have paid the increased production taxes under the Fair Share Act directly affect the incentives of the [Trade Associations] in which they have membership."

Fair Share points to two cases in which we determined that an organization's membership's interests established sufficient economic incentive to defeat constitutional claimant status. But both cases involved Rule 82 public interest litigants rather than constitutional claimants, and both are distinguishable on the facts. In *Fairbanks North Star Borough v. Interior Cabaret Hotel, Restaurant, & Retailers Association* (*ICHRRA*),[56] an alcohol beverage industry nonprofit group sued the borough to prevent an alcohol tax referendum from being placed on the ballot, explicitly acknowledging that it sued " 'because its members would be directly and adversely affected' by adoption of the tax ordinance."[57] ICHRRA's members were all for-profit businesses licensed to sell alcohol.[58] We concluded that the public interest litigant exception did not apply because ICHRRA's members' economic interest in avoiding the tax provided sufficient economic incentive to file suit.[59] But as the Trade Associations point out, that case involved a tax that would be applied directly to all of ICHRRA's members, so it was "undisputed that all of ICHRRA's members ha[d] some sort of direct financial interest."[60] Here, the ballot initiative sought to increase production taxes on oil from three major fields: Prudhoe Bay, Kuparuk, and Colville. And unlike ICHRRA's relatively uniform membership, the Trade Associations' memberships "consist of a broad constituency of individuals, organizations, and companies, the vast majority of which would not be directly impacted by a tax on oil

---

[56] 137 P.3d 289 (Alaska 2006).

[57] *Id.* at 291.

[58] *Id.* at 290.

[59] *Id.* at 292-94.

[60] *Id.* at 292.

production."[61] The economic interests of an organization's members and directors are relevant to assessing the primary motivation of litigation.[62] But here, the economic interest asserted is that some of the Trade Associations' members are oil and gas producers who would be subject to higher taxes if the Fair Share Act reached the ballot and if it were ultimately passed by Alaska's voters. We view the possibility that some members of the Trade Associations could avoid a potential future production tax, still subject to voter approval, as both indirect and attenuated.[63] Thus we conclude that the Trade Associations' interests here are too diffuse to constitute direct economic impact.

Further, we decline to reverse and remand for discovery into the funding sources of the litigation. We have rejected an approach that focuses on litigation funding sources. And we have specifically noted that seeking evidence beyond that which has already been developed in the course of the litigation is a misplaced and potentially misleading inquiry.[64] Fair Share repeatedly asserts facts suggesting

---

[61] The Trade Associations note the variety of organizational structures and interests among their members. For example, the "Resource Development Council for Alaska, Inc. is a statewide business association comprised of individuals and companies from Alaska's oil and gas, mining, forest products, tourism, and fisheries industries, including Alaska Native Corporations, local Alaska communities, organized labor, and industry support firms." Some, like the Alaska Trucking Association and Alaska Mining Association, represent specific industries and the companies that support those industries. Others are significantly broader across industries and interests, like the Alaska Chamber, which "is an Alaskan member-based group that has been the voice of the Alaska business community whose membership includes individual Alaskans, Alaska Native Corporations, oil and gas companies, trucking companies, banks, mining entities, and tourism companies."

[62] *See, e.g.*, *Kachemak Bay Watch, Inc. v. Noah*, 935 P.2d 816, 827-28 (Alaska 1997) (holding nonprofit had economic incentive because evidence presented at trial showed that three nonprofit directors would be directly economically impacted by litigation outcome).

[63] *See Alaska Conservation Found. v. Pebble Ltd. P'ship*, 350 P.3d 273, 281-83 (Alaska 2015).

[64] *See id.* at 285.

connections between the "major oil producers" and the campaign against the success of the ballot measure.[65] These facts may have influenced the ultimate success of the Vote No campaign at the ballot box,[66] but they are well beyond the contours of the underlying litigation in this case. Even if, as in *Holman*, there was evidence that third-party resource developers funded the litigation because they were interested in blocking the ballot measure, any financial benefit to the Trade Associations' various individual members would have been both speculative and attenuated by the ballot initiative process and the will of the voters.

While affirming the superior court's determination that the Trade Associations are constitutional claimants, we note that it was error to state that Fair Share had the burden to prove the Trade Associations' economic incentive. As Fair Share notes, the superior court indicated twice in its decision that Fair Share had the burden to prove the Trade Associations' direct economic interest. This is incorrect. The burden is on the Trade Associations to prove their lack of direct economic interest.

But the error is harmless in this context.[67] Regardless of whether the superior court proceeded as if Fair Share had the burden, the record supports the court's ultimate conclusion. The superior court "must 'look to the facts of the case to determine the litigant's primary motivation for filing the suit' " because those facts "inform the

---

[65] At the superior court, Fair Share cited quarterly reports showing that the counter-initiative campaign against the ballot measure (called OneAlaska — Vote No on One, or "Vote No") received most of its funding from BP Exploration Alaska, ExxonMobil, ConocoPhillips Alaska, and Hilcorp Energy. It also noted that both the Vote No campaign and the oil companies paid the law firms that employed the Trade Associations' counsel.

[66] *See* Elwood Brehmer, *Oil Tax Increase Defeated, but Revenue Issue Remains*, ALASKA J. COMMERCE. (Nov. 18, 2020, 9:02 AM), https://www.alaska journal.com/2020-11-18/oil-tax-increase-defeated-revenue-issue-remains.

[67] *Pedersen v. Blythe*, 292 P.3d 182, 184 (Alaska 2012) ("[W]e must disregard harmless errors that have no substantial effect on the rights of parties or on the outcome of the case.").

determination of primary purpose."[68] Here, the superior court's overall analysis reflects a thoughtful examination of the required factors to determine the primary purpose of the litigation: (1) "the nature of the claim and relief sought," and (2) "the direct economic interest at stake."[69] The court considered statements made by the Trade Associations throughout the litigation, the nature of the relief sought, and what, if any, direct economic impact the litigation would have. It also expressly considered Fair Share's assertions that the Trade Associations were "acting as proxies" for the major oil companies. This included consideration of our discussion of third-party economic interests in *Alaska Conservation Foundation*.[70] Based on these considerations the court reasoned that any increase in oil production taxes occurring "if the initiative was added to the ballot and it passed" was too "indirect or attenuated" to be the Trade Associations' primary motivation for bringing suit. Reviewing the record and recognizing the burden on the Trade Associations to prove their lack of direct economic incentive, we affirm the superior court's determination that the Trade Associations were constitutional claimants.

### C. It Was Error To Award Rule 82 Fees Against The Trade Associations.

We have recognized that the statutory language protecting qualifying constitutional claimants is "couched . . . in seemingly mandatory terms" as "AS 09.60.010(c)(2) states that a court 'may not order' a qualifying unsuccessful claimant to pay attorney's fees."[71] And we have consistently recognized that the statute protecting constitutional claimants is an "exception to Rule 82."[72] "A qualified

---

[68] *Alaska Conservation Found.*, 350 P.3d at 282 (quoting *O'Callaghan v. State*, 920 P.2d 1387, 1390 (Alaska 1996)).

[69] *Id.* at 281-82.

[70] *Id.* at 285.

[71] *Id.* at 284 n.60 (quoting AS 09.60.010(c)(2)).

[72] *Id.* at 280.

constitutional claimant is entitled to protection under AS 09.60.010(c)(2) against an attorney's fees award under Rule 82."[73]  Fees should not be awarded against a constitutional claimant who brings claims that are neither frivolous nor primarily economically motivated.[74]

The Trade Associations argue that the superior court erred by concluding that the constitutional claimant statute "does not protect constitutional claimants from adverse fee awards under Rule 82" and awarding Rule 82 fees against them.  Fair Share concedes that if the Trade Associations are deemed constitutional claimants, "they are not subject to any award of fees."  We agree.  As discussed above, the Trade Associations are constitutional claimants and the case involves only constitutional claims.  The Trade Associations are therefore shielded from an attorney's fee award.  It was error for the superior court to conduct a Rule 82 analysis.  We thus vacate the superior court's attorney's fees award to Fair Share.

## V.     CONCLUSION

We AFFIRM the superior court's determination that the Trade Associations are constitutional claimants, and we VACATE the superior court's attorney's fees award to Fair Share.

---

[73]     *Taylor v. Alaska Legis. Affs. Agency*, 529 P.3d 1146, 1160 (Alaska 2023).

[74]     We note that the statute only protects constitutional claimants against attorney's fee awards for those fees "devoted to claims concerning" constitutional rights.  AS 09.60.010(d)(1).  We have clarified that "Rule 82 attorney fees may be awarded only for work that would not have been necessary but for a non-constitutional claim." *Lake & Peninsula Borough Assembly v. Oberlatz*, 329 P.3d 214, 228 (Alaska 2014).  In other words, if the suit includes separate, non-constitutional claims, fees could be awarded based on work on those claims.  Here, however, Fair Share does not argue that any portion of the litigation between the parties was unnecessary to constitutional claims.

WINFREE, Chief Justice, with whom CARNEY, Justice, joins concurring in part.

I agree with today's decision because it correctly resolves the parties' attorney's fees dispute as litigated in the superior court and argued to us in this appeal. But there has long been an elephant in the courtroom when one private party seeks to obtain or avoid attorney's fees vis à vis another private party, rather than a government entity, under AS 09.60.010's "constitutional claimant" attorney's fees framework.[1] If it is true that vindication of a private party's constitutional rights is sought against the government because only the government can violate a private party's constitutional rights,[2] how is it that a private party can be a "constitutional claimant" against another private party and invoke the benefit or protection of AS 09.60.010?

---

[1]    We summarized the effect of AS 09.60.010 in *Alaska Conservation Found. v. Pebble Ltd. P'ship*, 350 P.3d 273, 274 (Alaska 2015):

> The statute both encourages and protects those challenging governmental action as a violation of federal or state constitutional rights. First, the statute provides that a successful claimant generally is entitled to an award of full reasonable attorney's fees and costs incurred in connection with a constitutional claim, unless the claimant had ''sufficient economic incentive'' to bring the claim regardless of its constitutional nature. Second, the statute protects an unsuccessful claimant from an adverse attorney's fees award if the constitutional claim was not frivolous and the claimant did not have ''sufficient economic incentive'' to bring the claim regardless of its constitutional nature.

[2]    *See, e.g.*, *Belluomini v. Fred Meyer of Alaska, Inc.*, 993 P.2d 1009, 1015 (Alaska 1999) (describing "long-standing legal principle" that "state and federal courts have historically recognized that the constitution protects individuals from state action but not from similar deprivations by private actors"); *Baker v. City of Fairbanks*, 471 P.2d 386, 394 (Alaska 1970) ("The American constitutional theory is that constitutions are a restraining force against the abuse of governmental power, not that individual rights are a matter of governmental sufferance."); *see also State v. Alaska State Emps. Ass'n/Am. Fed'n of State, Cnty. & Mun. Emps.*, 529 P.3d 547, 557 (Alaska 2023)

Our case law has developed considerably since we recognized in *State v. Native Village of Nunapitchuk* that the legislature had exercised its constitutional authority to abrogate our common law "public interest litigation" attorney's fees framework and replace it with the narrower constitutional litigation framework of AS 09.60.010.[3] We soon thereafter stated that for the party prevailing against the State on a constitutional claim, AS 09.60.010 controlled the award of attorney's fees to the exclusion of Alaska Civil Rule 82[4] and the former public interest litigation doctrine.[5] In two later cases we established parameters for determining whether, to qualify as a

---

(explaining that no First Amendment violation occurs unless claimant shows that state or federal government was entity curtailing right to speak or associate); *Anderson v. Alaska Hous. Fin. Corp.*, 462 P.3d 19, 25 (Alaska 2020) (explaining that Alaska Constitution's due process clause requires claimant to prove existence of "state action and the deprivation of an individual interest of sufficient importance to warrant constitutional protection"); *Miller v. Safeway, Inc.*, 102 P.3d 282, 288 (Alaska 2004) (explaining that Alaska Constitution's right to privacy applies to "unwarranted intrusions by the government" and not by private parties); *State v. Planned Parenthood of Alaska*, 35 P.3d 30, 38 (Alaska 2001) (explaining that Alaska Constitution's art. 1, § 3's equal protection provision restrains only state action).

[3]    134 P.3d 389, 391-92, 395, 402-06 (Alaska 2007) (discussing history of public interest litigation framework and legislative enactment abrogating and replacing it with AS 09.60.010); *see also Krone v. State, Dep't of Health & Soc. Servs.*, 222 P.3d 250, 253-54, 255-57 (Alaska 2009) (discussing legislature's abrogation of public interest litigation framework and its replacement with AS 09.60.010); *Alaska Conservation Found.*, 350 P.3d at 274 (noting that AS 09.60.010 was "enacted to abrogate our previous common law public interest litigation attorney's fees framework and replace it with a narrower constitutional litigation framework").

[4]    *See* Alaska R. Civ. P. 82(a) ("Except as otherwise provided by law or agreed to by the parties, the prevailing party in a civil case shall be awarded attorney's fees calculated under this rule.").

[5]    *Krone*, 222 P.3d at 257.

constitutional claimant under AS 09.60.010, a party lacked "sufficient economic incentive" to bring a constitutional claim regardless of its constitutional nature.[6]

In *Alaska Conservation Foundation* a number of individuals and a non-profit entity sued the State for allegedly issuing constitutionally defective land and water use permits to Pebble Limited Partnership in connection with the proposed Pebble Mine.[7] The Pebble Limited Partnership intervened as a party-defendant aligned with the State.[8] The State and the Pebble Limited Partnership prevailed on the constitutional claim and attorney's fees litigation under AS 09.60.010 ensued.[9] The Pebble Limited Partnership sought wide-ranging discovery from the plaintiffs and certain non-parties about the plaintiffs' economic interests and obtained superior court orders compelling the discovery.[10] We granted a petition for review and an original application for relief on the superior court's discovery rulings and consolidated them for decision.[11]

We issued two related opinions the same day, one reversing the superior court's merits-decision rejecting the plaintiffs' constitutional claim[12] and the other reversing the superior court's discovery rulings.[13] We recognized that, because our first decision resulted in the plaintiffs being prevailing constitutional claimants, the award of attorney's fees had to be reversed and the plaintiffs then would be entitled to seek

---

[6]      *Alaska Conservation Found.*, 350 P.3d at 281-86; *Alaska Miners Ass'n v. Holman*, 397 P.3d 312, 316-17 (Alaska 2017).

[7]      350 P.3d at 275.

[8]      *Id.*

[9]      *Id.*

[10]      *Id.* at 275-78.

[11]      *Id.* at 274.

[12]      *Nunamta Aulukestai v. State, Dep't Nat. Res.*, 351 P.3d 1041, 1064 (Alaska 2015).

[13]      *Alaska Conservation Found.*, 350 P.3d at 286.

attorney's fees in the superior court.[14] Concluding that the attorney's fees litigation still would require a decision on the discovery disputes, and specifically the correct analysis for analyzing sufficient economic incentive to bring constitutional claims, we reached those issues.[15]

We reversed the discovery order and concluded that the case was about potential constitutional limitations on State-issued land and water use permits for which there was not sufficient economic incentive to bring the action absent the constitutional issue.[16] Along the way we rejected the arguments that the plaintiffs were merely stalking horses for fisheries and tourism interests opposed to the Pebble Mine and that those interests had sufficient economic incentive to bring the lawsuit, focusing instead on whether the ultimate decision on the constitutional issue could have a direct economic impact on anyone.[17] Answering that question "no," we remanded for proceedings in which the plaintiffs, as qualified prevailing constitutional claimants, could seek an AS 09.60.010(c)(1) attorney's fees award.[18] *Whether the Pebble Limited Partnership or the plaintiffs could rely on AS 09.60.010 to seek or avoid an attorney's fees award vis à vis the other was not an issue before us.*[19]

In *Holman* a number of parties (Alaska Miners) aligned with the Pebble Limited Partnership sued the State to challenge, on state constitutional grounds, the certification of a ballot initiative that would require final legislative approval for large-scale mining operations located within certain watersheds, such as the proposed Pebble

---

[14]     *Id.* at 274-75.

[15]     *Id.*

[16]     *Id.* at 286.

[17]     *Id.*

[18]     *Id.* at 286.

[19]     *Cf. id.* at 274 (stating that AS 09.60.010 "encourages and protects those challenging governmental action as a violation of federal or state constitutional rights").

Mine.[20]  The ballot initiative sponsors collectively (Holman) intervened as a party-defendant aligned with the State to defend the ballot initiative.[21]  The State and Holman prevailed on the constitutional issue and we later affirmed that decision on appeal.[22]  Holman then sought AS 09.60.010 attorney's fees against the Alaska Miners as a prevailing constitutional litigant.[23]  The Alaska Miners countered that they were non-prevailing constitutional claimants entitled to protection against an attorney's fees award, and that Holman, as an intervenor-defendant, could not meet the statutory requirement that a constitutional claimant be a plaintiff, counterclaimant, cross-claimant, or third-party plaintiff.[24]  The superior court awarded full reasonable attorney's fees to Holman, first concluding that Holman was effectively a "claimant" despite being an intervenor-defendant and then concluding that because the Pebble Limited Partnership had agreed to indemnify the Alaska Miners and the Pebble Limited Partnership had a sufficient economic interest in bringing the claim regardless of its constitutional nature, the Alaska Miners were not protected by AS 09.60.010(c)(2).[25]

We reversed the superior court's decision.  Noting that the case was the "mirror image" of *Alaska Conservation Foundation*,[26] we rejected the superior court's

---

[20]     *Alaska Miners Ass'n v. Holman*, 397 P.3d at 313 (Alaska 2017).

[21]     *Id.*

[22]     *Id.* (citing *Hughes v. Treadwell*, 341 P.3d 1121, 1134 (Alaska 2015)).

[23]     *Id.* at 314.

[24]     *Id.*; *cf.* AS 09.60.010(c)(2) (providing qualified non-prevailing constitutional claimant protection against an attorney's fee award); AS 09.60.010(c)(1) (referring to constitutional claimant as "plaintiff, counterclaimant, crossclaimant, or third-party plaintiff" in action concerning constitutional rights).  The Alaska Miners couched its latter superior court argument to be that the statute was intended to protect persons who raised constitutional claims against the State but not to protect intervenor-defendants against private parties.  397 P.3d at 314.

[25]     *Holman*, 397 P.3d at 315.

[26]     *Id.* at 316.

real-party-in-interest analysis and concluded that the case was about constitutional limitations on Alaska's ballot initiative process and not about direct economic interests.[27] Because the only issue before us was whether the Alaska Miners had "sufficient economic incentive" to bring its suit against the State,[28] we reversed the award of AS 09.60.010 attorney's fees against the Alaska Miners and in favor of Holman.[29] *Whether the two private parties could rely on AS 09.60.010 to obtain or avoid attorney's fees awards vis à vis each other — and how the statutory language about a claimant being a plaintiff asserting a constitutional claim rather than being a defendant defending a constitutional claim might play in the analysis — was not resolved in our decision.*[30]

In the case before us now, the AS 09.60.010 attorney's fees dispute again is between private parties and does not involve the State. The plaintiff trade

---

[27]     *Id.* at 317.

[28]     *Id.* at 316.

[29]     *Id.* at 318.

[30]     The statutory definition of a claimant was an issue in more recent superior court litigation, although it was not an issue in the subsequent appeal. In *Taylor v. Alaska Legis. Affs. Agency* the attorney general sued a legislative agency for declaratory judgment on a constitutional question about the effective date of budget appropriations. 529 P.3d 1146, 1148-51 (Alaska 2023). The superior court ruled in favor of the legislative agency, which then sought AS 09.60.010(c)(1) attorney's fees. *Id.* at 1160. The superior court agreed with the attorney general that the agency did not qualify as a constitutional claimant because it was a defendant in the action, not a plaintiff, but it did award attorney's fees to the agency under Civil Rule 82. *Id.* at 1152. The attorney general appealed the merits of the constitutional ruling and the attorney's fees award. *Id.* The agency did not appeal the ruling that it was not entitled to an award of attorney's fees under AS 09.60.010(c)(1). *Id.* at 1159. We affirmed the superior court's decision on the constitutional issue but vacated the attorney's fees award because the court had not resolved the attorney general's contention that he was entitled to protection against the fees award under AS 09.60.010(c)(2). *Id.* at 1160 (noting we took no position on whether the attorney general, or any state agency, could be a qualified constitutional claimant under the statute).

associations (Trade Associations) sued the State and the ballot initiative sponsor (Fair Share), contending that the collection and certification of signatures violated AS 15.45.130 and AS 15.45.110(c). But the constitutionality of AS 15.45.110(c) became a central issue in the litigation, and the State and Fair Share prevailed on that constitutional issue. Fair Share sought AS 09.60.010(c)(1) attorney's fees against the Trade Associations as a successful constitutional claimant, arguing that it had successfully defended "against [the Trade Associations'] efforts to impair the constitutional rights to initiative and political speech." The Trade Associations responded that Fair Share had not been a "plaintiff, counterclaimant, cross claimant, or third-party plaintiff" in the action, had not raised a constitutional claim in its pleadings, and therefore could not be a constitutional claimant under the statute. They alternatively argued that they were qualified non-prevailing constitutional claimants and protected against an attorney's fees award under AS 09.60.010(c)(2). Like the superior court in *Holman* but unlike the superior court in *Taylor*, the superior court accepted Fair Share's argument and concluded that Fair Share was a constitutional claimant despite not being a plaintiff-like party, entitling it to attorney's fees under AS 09.60.010(c)(1) if otherwise qualified. But the court went on to conclude that the Trade Associations were qualified non-prevailing constitutional claimants protected by AS 09.60.010(c)(2), thus precluding an award of attorney's fees.

Today's decision correctly affirms the superior court's ruling that the Trade Associations are qualified non-prevailing constitutional claimants entitled to the protection of AS 09.60.010(c)(2) with respect to its constitutional claim. As litigated in the superior court and argued to us by Fair Share on appeal, that resolves the narrow dispute before us. But our narrow ruling begs the elephantine question: Can AS 09.60.010 be interpreted to provide a private party with the right to obtain or avoid an attorney's fees award vis à vis another private party who did not and could not violate another private party's constitutional rights? The language of the statute, when delineating who can be a claimant, suggests the statute is limited to someone suing the

government on a constitutional question, which seems consistent with the statute's intent.[31]   This then suggests that as to a dispute between private parties about constitutional interpretation, Civil Rule 82 and not AS 09.60.010 applies.  There also remains the related question whether a private or government entity defendant can potentially qualify as a constitutional claimant entitled to protection under AS 09.60.010(c)(2) merely by opposing a constitutional claim with a competing constitutional analysis, thus eviscerating the legislature's intent to encourage citizens to bring actions to protect their constitutional rights.[32]  But, because these issues are not before us, we have no analysis of the statutory language, no presentation about legislative history and intent, and no adversarial arguments on how the statute should be read in this context.  At some point these issues need to be presented and resolved.

---

[31]     *See supra* note 1.

[32]     *Cf. supra* notes 1 and 30 (and related text).